**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) **No. 17 CV 5396** |
| *Plaintiff,* | ) |
| | ) **Honorable John J. Tharp** |
| vs. | ) **Judge Presiding** |
| | ) |
| **JOHN GABRIEL,** | ) |
| | ) |
| *Defendant.* | ) |

**MEMORANDUM OF LAW IN SUPPORT OF AMENDED MOTION TO VACATE AND
SET ASIDE JUDGMENT AND SENTENCE PURSUANT TO 28 U.S.C. § 2255**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

    A.    The Relevant Standards Under Section 2255 .........................................2

    B.    Statement of Facts.................................................................................2

II.   GABRIEL WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL IN
    VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES
    CONSTITUTION ...............................................................................................38

    A.    The Strickland Standards ...................................................................38

    B.    Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was
        violated when counsel failed to object to the admission of Toni's emails pursuant .
        to Federal Rules of Evidence  801 and 403 ........................................39

    C.    Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was
        violated when counsel failed to object to the admission of Eddie Kline's emails
        under Federal Rules of Evidence 801 and 403 ...................................42

    D.    Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was
        violated when counsel failed to object to the admission of Crystal Barnabee's
        letters under Federal Rules of Evidence 801 and 901...........................44

    E.    Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was
        violated when counsel failed to object to the improper questioning of Gabriel
        about the pending criminal case involving Margarita Hernandez ........................46

    F.    Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was
        violated when counsel failed to impeach "Toni."................................49

    G.    Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was
        violated when counsel failed to cross-examine FBI Special Agent Ingri Hartwig
        on three material issues...........................................................51

    H.    Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was
        violated when counsel failed to argue a defense based on the evidence  .............53

    I.    Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was
        violated when counsel failed to object to the constructive amendment of the
        Indictment ...........................................................................56

i

III.  GABRIEL WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION ........................................................................................58

IV.  GABRIEL WAS DENIED HIS FIFTH AMENDMENT RIGHT TO A FAIR TRIAL BY THE GOVERNMENT'S USE OF FALSE TESTIMONY ...............................................59

V.  CONCLUSION.......................................................................................................61

## TABLE OF AUTHORITIES

### CASES

*United States v. Boros*, 668 F.3d 901 (7th Cir. 2012)....................................................48

*United States v. Fluker*, 698 F.3d 988 (7th Cir. 2012).................................................45

*United States v. Freeman*, No. 07 CR 843, 2009 U.S. Dist. LEXIS 76973 (N.D. Ill. Aug. 26, 2009) ...............................................................................................................................60

*United States v. Jackson*, 208 F.3d 633 (7th Cir. 2000) ............................................40, 41, 43, 46

*United States v. Loughry*, 660 F.3d 965 (7th Cir. 2011)........................................42, 44

*United States v. Stewart*, 388 F.3d 1079 (7th Cir. 2004)..............................................59

*United States v. Wilbourn*, 799 F.3d 900 (7th Cir. 2015) ...............................................60

*Napue v. Illinois,* 360 U.S. 264 (1959) ...........................................................................60

*Raygoza v. Hulick*, 474 F.3d 958 (7th Cir. 2007).........................................................38

*Stirone v. United States*, 361 U.S. 212 (1960)................................................................58

*Strickland v. Washington,* 466 U.S. 668 (1984) .......................................38, 39, 51, 56

*Williams v. Lemmon*, 557 F.3d 534 (7th Cir. 2009)...............................................38, 56

### STATUTES

Title 18 United States Code Section 2251(a)................................................................56, 57

Title 28 United States Code Section 2255 ................................................................1, 2, 59, 61

OTHER AUTHORITIES

Federal Rule of Evidence 403 .................................................................................................41, 43

Federal Rule of Evidence 801 ...........................................................................................41, 43, 46

Federal Rule of Evidence 901 .....................................................................................................45

## I.      INTRODUCTION

The evidence presented herein shows that Gabriel's Constitutional rights were violated in two ways, each of which entitles him to relief.

First, Mr. Gabriel was denied his right under the Sixth Amendment to Effective Assistance of counsel, at trial and on appeal. As set forth fully below, Mr. Gabriel was denied effective assistance of counsel when trial counsel failed to: object to the admission of certain portions of emails between Toni H.[1] and various other persons; object to the admission of the Eddie Kline emails; object to the admission of the Crystal Barnabee letters; object to improper questioning; impeach Toni with her prior statements to law enforcement; effectively cross-examine Agent Hartwig; present a closing argument based on the evidence; object to the constructive amendment of the indictment; and present certain ripe issues on appeal.

In addition, Mr. Gabriel's right to a fair trial was denied by the government's presentation of false testimony of its case agent that she found sexually explicit photos of Toni on Gabriel's computer that were taken with Gabriel's phone.

Mr. Gabriel's Amended Motion To Vacate And Set Aside Judgment And Sentence Pursuant To 28 U.S.C. § 2255, together with accompanying exhibits, presents facts showing that Gabriel is entitled to relief under § 2255. Because our system of justice is firmly committed to remedying violations of fundamental constitutional rights, Mr. Gabriel now brings this motion pursuant to 28 U.S.C. § 2255, and asks this Court to hold an evidentiary hearing, and grant appropriate relief under 28 U.S.C. § 2255, including dismissal of the indictment, or a new trial.

---

[1] Although her full name is now a part of the public record, throughout this memorandum counsel will refer to this witness as "Toni."

### A.     The Relevant Standards Under Section 2255

28 U.S.C. § 2255 affords a prisoner in federal custody relief if he can show that he was convicted or sentenced in violation of the Constitution or laws of the United States. 28 U.S.C. § 2255(a). "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). If a Court "finds . . . that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *Id.*

### B.     Statement of Facts

#### Overview

The charges in this case were based on an investigation started by the Chicago Police Department in response to a complaint made by Sandra Hernandez ("Sandra"), the mother of Toni H. ("Toni") and Melissa Hernandez ("Melissa"). In short, on or about July 16, 2012, Sandra's boyfriend discovered what he believed to be inappropriate emails on Toni's iPod, and alerted Sandra.  According to police reports and the testimony of Special Agent Ingri Hartwig, The emails in question were forwarded to Sandra, who provided copies to law enforcement. Chicago Police Officers interviewed Toni and Sandra, and eventually alerted the FBI, who took over the investigation.  The FBI investigation uncovered evidence of what agents believed to be a group of people –including Movant, John Gabriel ("Gabriel") and his live-in girlfriend, Toni and Melissa's cousin, Margarita Hernandez ("Margarita") – who were involved in arranging for

women to have sex with minor boys, purportedly to save the boys from bad behavior that could lead them to the devil.

The government's theory at trial was that John Gabriel was the mastermind behind "The Program," in which women known as "priestesses" and "novatas" had sex with young boys who ranged in age from approximately14-years-old to 18-years-old, in order to trick the devil and save the boys from leading lives of sin. According to the government, Gabriel set his sights on Toni, and began a complicated email campaign in which he created multiple aliases in order to persuade Toni to join the program. Once Toni was persuaded to join the program, Gabriel arranged to give her sexual massages, during which he would touch her genitals, and she would touch his genitals. As a separate matter, not part of the sexual massage, the government contended that Gabriel took nude photos of Toni, so that those photos could be posted on a website, for the purpose of enticing young boys to have sex with Toni. It was undisputed at trial that Toni's sister Melissa, her Aunt Maria "Cuca" Davila, and her cousin Margarita Hernandez were all involved in "the program."

There were two main issues at trial: first, whether or not Gabriel was the person who sent all of the emails from purported angels and priestesses to Toni; and, second, whether or not Gabriel was the person who took the sexually explicit photos of Toni at issue. The evidence as to the emails was presented primarily through the testimony of FBI Special Agent Ingri Hartwig, who read large portions of emails between Toni and various other persons who claimed to be connected to the program, including a person named "John," who the government argued was Movant John Gabriel. The government also presented testimony of witnesses from Yahoo, Staminus Communications, iPage, and Eddie Kline, to make its case that all of the emails to Toni actually came from Gabriel. The government's evidence as to the identity of the person who took

the photos was presented primarily through Toni's testimony, together with the emails read into the record by Agent Hartwig, and the testimony of Michael Theis, from the Regional Computer Forensics Laboratory (RCFL).

### Pretrial Motions Relevant to Movant's Claims

On February 12, 2015, defense counsel filed a motion *in limine* to prohibit introduction of evidence without foundation, specifically emails between Toni and various other persons, the identity of whom was at issue in this case. (R. 53).[2] The government filed a response (R. 61), and the motion was argued to the Court on March 2, 2015. The Court found that the government's proffered evidence was "sufficient for the Court to conclude that there will be evidence presented at trial that is sufficient to support a jury conclusion that Mr. Gabriel authored those emails or, alternatively, that those emails, whether authored specifically by Mr. Gabriel or someone else, were authored by someone for the purpose of furthering Mr. Gabriel's relationship and conduct with respect to victim A," and that the emails were relevant. The Court denied the motion. (R. 121).

On February 17, 2015, the government filed a motion *in limine* to admit evidence pursuant to Federal Rule of Evidence 404(b) (R. 59). Specifically, the government sought to introduce a letter written by "Di" to Margarita in 2002, a phone call between Gabriel and Margarita, and three letters written by Crystal Barnabee and found in Gabriel's home. Defense counsel filed a response (R. 62), and the motion was argued before the Court on March 2, 2015. The Court found the defense objection to be one of authentication of the letters, and granted the government's motion. (R. 121).

---

[2] Citations to the Record in the underlying criminal case are presented here as "R." Citations to transcripts of the trial as "Tr.".

On February 27, 2015, the government filed a motion to amend the indictment and strike surplusage in both Count I and Count II. (R. 65). Defense counsel filed a response (R. 66), and the motion was argued on March 2, 2015. Defense counsel had no objection to the government's motion to strike surplusage from Count I. (R. 121). The Court continued the matter for further argument related to Count II, which was ultimately dismissed prior to trial.

### Testimony at Trial

The trial in this case spanned four days, from March 16 to March 19, 2012. In its case-in-chief, the government called Sherry Hoyt, the Yahoo custodian of records, Arad Mahdavi, CIO of Staminus Communications, FBI Special Agent Ingri Hartwig, Michael Theis, from the Chicago Police Department's Regional Computer Forensics Laboratory (RCFL), Katherine Rinehart from iPage, Edward Kline, and Antonia "Toni" H. The defense called Joshua Perez and John Gabriel. In rebuttal, the government recalled Special Agent Hartwig.

### Sherry Hoyt

Sherry Hoyt, the custodian of records for Yahoo, testified that to sign up for an account, a potential user must simply provide a first name and a last name, birth date, and gender. The user then must select a user name, create a password, and agree to Yahoo's terms of service. (Tr. 26). Hoyt further testified that for the yahoo account "mygirls4god," the registration IP address was 72.20.28.44. Yahoo captured the IP information, it was not generated by Yahoo. The IP information is generated by Internet Service Provider (ISP") through which the accessed the Internet. Yahoo provided emails pursuant to subpoena for the account toniholderbaum@yahoo.com, identified as Government Exhibit Yahoo Disc 1, and for the account eddiekline@ymail.com (sic), identified as Government Exhibit Yahoo Disc 2. (Tr. 36).

On cross-examination, Hoyt confirmed that a user who signs up as "Diane McCarthy" might not really be Diane McCarthy, and a user who signs up as "John Gabriel" might not really be John Gabriel. (Tr. 38).

### Arad Mahdavi

Arad Mahdavi, CIO at Staminus Communications, a server hosting company, testified that, according to Satminus's records, the IP addresses 72.20.28.44 and 72.20.28.122 were registered to "EasyTech," with a "company ID" of Easy-Hide-IP." (Tr. 40). On cross-examination, Mahdavit testified that the IP addresses were assigned to a customer whose contact information was in England, and whose billing information was out of Spain. (Tr. 41-42).

### Ingri Hartwig

The government next called Ingri Hartwig ("Hartwig"), a Special Agent with the FBI, testified that she is part of a squad that investigates "violent crimes against children." (Tr. 43). Toni's mother, Sandra Hernandez ("Sandra") forwarded emails from Toni's account "into her personal email and printed them out and brought them" to the FBI. (Tr. 44). The FBI subpoenaed Yahoo and received emails from the account "toniholderbaum@yahoo.com," which Hartwig identified as being on Government Exhibit Yahoo Disc 1, and Government Exhibit Email 1 through Email 105. (Tr. 45). Defense counsel did not object to the introduction of the emails. (*Id*.).

Hartwig testified extensively about emails between "mygirls4god@yahoo.com," purportedly the email address of a Sarah Weatherby ("Weatherby") and "toniholderbaum@yahoo.com," the email address of Toni. (Tr. 46). Agent Hartwig's testimony spanned over 250 pages, and consisted largely of reading emails into the record. A brief summary of the testimony relevant to the issues raised by Gabriel is presented here.

6

The very first email offered by the government was from June 12, 2012, which began, "Hello, Toni. I am Sarah. Your sister Melissa has asked me to contact you. I have heard the good news about you from Theresa," who Hartwig testified was "someone Toni was told was her angel." (Tr. 47-48). Further down in the email chain, Weatherby wrote, "I suggest you ask questions of John." Hartwig testified that she was able to determine that "John" in "these emails," was John Gabriel. (Tr. 48). Hartwig also identified "Margarita" who was referenced in the email chain as being "Margarita Hernandez, the defendant's live-in girlfriend," who was also Toni's cousin. (Tr. 49).

Hartwig described the FBI investigation to locate Weatherby, and testified that they did not find anyone matching the information provided to Yahoo for the Weatherby email account. (Tr. 51-54). The FBI recovered 19 emails from the Weatherby email account, but none were between Weatherby and Toni, and the Weatherby account was deactivated. (Tr. 54).

In a series of emails between Weatherby and Toni, the two discuss the Bible, Toni's ex-boyfriend, and love. Weatherby encourages Toni to "talk more with John", who Hartwig identifies as "the defendant." (Tr. 55-58). Hartwig then confirms that "anytime we see the name John," in the emails, it is "the defendant." (Tr. 58). In later emails, Weatherby informs Toni that John picked up medals for Toni and her sister, Melissa (Tr. 62), and also discuss the church, family, and Weatherby praises John and his "high qualities." (Tr. 62-63). Weatherby explains that she will tell Toni more about God, and "him," meaning John, because she is confident Toni will not tell anyone else. Toni responds, "I have kept everything to myself, like who I've talked to and about the board and Theresa." (Tr. 63). Weatherby writes that she will reveal more information to Toni over time, and that some of the information may "shock" her. (Tr. 64). At the end of this email chain, Weatherby informs Toni that a special email has been set up for Toni

to communicate with "John," john@idu2.com. (Tr. 66). Hartwig stated that as a result of her investigation, she knows that john@idu2.com is Gabriel.[3] (Tr. 67).

Hartwig continued to read emails between Weatherby and Toni into the record, as well as emails between john@idu2.com and Toni.  The emails from john@idu2.com include conversations about God, the devil, infatuation, sex, and spending more time with "Margarita and me," going to "county fairs and things." (Tr. 76-77). Interspersed with Hartwig's recitation of the "mygirls4god" and "john@idu2" emails are emails from other people, including Diane McCarthy ("McCarthy") who sent Toni an email with an attachment titled, "The Aura," which describes in detail how a person receives energy by touching a person's genitals, hand-holding, or gentle rubbing. (Tr. 78-79). Hartwig described the investigative attempt to identify Mccarthy, which was unsuccessful. (Tr. 81-83). In a later email with Weatherby, Toni acknowledged receiving "the attachment about auras," and commented that it would be "weird to hold his hand." (Tr. 88).

Hartwig read additional emails from Weatherby, in which Weatherby revealed herself to be an angel, described John as being blessed, and suggested that Toni talk to John more. In addition, Weatherby advised that she would tell John to explain to Toni what spiritual mates and priestesses are, and what they do. (Tr. 89). In a later email with john@idu2.com, Toni wrote, "Thank you for explaining what a priestess and spiritual mate is." (Tr. 93). In later emails, Weatherby encouraged Toni to trust John and to touch him, and also discussed that Toni would receive her "medal," and that Toni will learn of its powers later. (Tr. 96-98). Toni wrote that

---

3 Movant will use the shorthand "John" to reference the email address "john@idu2.com," but does not concede that Gabriel was the person who sent all of the emails from "john@idu2.com." Throughout her testimony, Agent Hartwig identified the emails from "john@idu2.com" as being from "the defendant."

John told her she would receive her medal at Church that Sunday, (Tr. 96.) and later, on July 1, 2012, wrote that she had, in fact, received her medal. (Tr. 100).

Hartwig continued to read emails, including one wherein Weatherby advised Toni that now that she had her medal, she would start seeing John differently, and have strong feelings of love for him. (Tr. 101). Weatherby advised Toni that she had approved McCarthy telling Toni about the program, and referenced a "priestess" named "Crystal Marie." (Tr. 103). Toni wrote of the program that she thought it sounded "crazy." (*Id*.). Weatherby advised Toni that John would be her spiritual mate, and explained that John was a sought-after spiritual mate. (Tr. 103-111).

Agent Hartwig read from an attachment to an email sent by McCarthy titled, "Lesson 4, Pheromones and Love Energy," which described putting a spiritual mate into a trance and having him perform oral sex. (Tr. 124). Hartwig stated that part of the attachment titled "God Made Your Body to Be a Power Center," was something she had seen previously on Gabriel's computer." (Tr. 130-31).

Hartwig read an email chain between Toni and McCarthy, which suggested that Toni read the materials McCarthy sent, and expressed surprise that she "would have sex with guys," if she were to become a novata. (Tr. 135-36). Toni wrote that it sounded "pretty crazy," and expressed regret that she couldn't talk with her sister about it. (Tr. 136). At this point in the email chain, McCarthy wrote that Margarita had been "training guys for a long, long time," and "John has the responsibility to find them." (Tr. 137). McCarthy told Toni to look at Margarita's facebook page, and described the positive aspects of the program. Toni wrote that she was not upset to know what the program was, "just surprised." McCarthy advised that Toni should ask John for the password to Margarita's website, and wrote that it would "blow your mind." (Tr. 139). McCarthy asked Toni about her sexual experience, and Toni admitted that she had been

very sexually active in the past. (Tr. 140). McCarthy then suggests that Toni and Margarita could "do a threesome," if Toni were a novata, and explained that "we" had a supporter who buys seeing eye dogs for the blind every time "Margarita or a couple other priestesses train a guy." (Tr. 142).

Agent Hartwig testified that on August 16, 2012the FBI executed a search warrant on Gabriel and Margarita's home, and that they seized one typewritten letter dated in 2002, written by someone purporting to be "Di," and addressed to Margarita." (Tr. 147). The letter, Government Exhibit Margarita Letter, was admitted without objection. (Tr. 148). In the letter, the writer references "Sarah," "priestesses," "Ti," "John John" angels, and "personal services." The letter, in part, refers to trouble that "John John" and Margarita are having in their relationship. (Tr. 148-150). Next, Hartwig identified Government Exhibit Phone Call, which was a phone call from December 8, 2013, between Gabriel and Margarita. The call was admitted pursuant to stipulation. (Tr. 151-52).

Next, Hartwig read emails from various others, including Marie Stennis, Amity Shaw, Kelly Meirs, Kelly Fisher, and Trudy Cohms, who all claimed to be involved with the program. In the emails, the women touted the positive results achieved through the program, described the sexual aspects of the program, and asked Toni to contact them if she did not become a novata, so that they could tell friends who wanted to become a novata. The FBI did not locate Marie Stennis, Amity Shaw, Kelly Meirs, Kelly Fisher, or Trudy Cohms. (Tr. 157-177; 192-97).

The government introduced a piece of paper as Government Exhibit Yahoo 1 that appeared to be registration information for Kelly Meirs' email account, "idowanta@rocketmail.com," which was found during the search of Gabriel and Margarita's home. (Tr. 171-72).

Agent Hartwig testified about an email chain between Weatherby and Toni from July 3 to July 4, 2012. (Tr. 178). Weatherby asked Toni if she would like to have a medal ceremony with angels, wherein John would put the medal around Toni's neck, and Toni responded that she would. (Tr. 179). Toni wrote that she saw Maragarita's website, and asked if she would have a website as a Novata. Weatherby confirmed that she would. (Tr. 182).

Agent Hartwig also read an email chain between John and Toni from July 3, 2012. (Tr. 183). In it, Toni mentioned that she received emails from others describing the program, and John responded that Toni should not feel like she is being pushed into something, because God gave us free will so we can make choices. (Tr. 184). John and Toni discuss "Cuca" and Melissa, the consequences of sinning while you are in the program, and Toni's upcoming medal ceremony. (Tr. 185-87). Toni asked to see Margarita's website, and John responded with information to access the site "www.itschica.com." (Tr. 188). Agent Hartwig visited that web address on some unidentified date, and "was unable to get into" the website, because the password "didn't work." (Tr. 188). Toni wrote that some of the comments on the website made her laugh, and asked if she would have her own website, were she to become a novata. John responded that she would, and wrote that he took the photos on Margarita's website, that they are nudes but they have a purpose. (Tr. 190). Toni wrote that she went to the website again, and it was a recipe site. John responded that that is how he protects the website. (*Id.*).

Next, Hartwig read an email between Weatherby and Toni from July 4, 2012, in which Weatherby describes in great detail how "love energy" is transferred between a spiritual mate and a novata or priestess. (Tr. 198-99). In that same email chain, Toni agrees to become a novata. (Tr. 201). Later that same day, in another email chain with Weatherby (Government Exhibit

11

Email 56), Toni wrote that Melissa congratulated her, and commented that she did not know Melissa was a novata, too. (Tr. 204).

In a series of emails between Toni and John on July 4, 2012, there was discussion of setting up an email account for Toni, "yes@idu2.com." (Tr. 206). The FBI was unable to obtain emails from "yes@idu2.com." (Tr. 207). Next, there was discussion of setting up a facebook page for Toni, with the "training name" Toni Delgado, that would be set up "next week" when they have a profile photo. John wrote that they don't talk to "guys" on facebook. (Tr. 208). Hartwig read an email from July 5, 2012, between Toni and John, in which John wrote that Toni will be nude for photos and energy massages, so she would have to have confidence in him. (Tr. 209).

Hartwig next read an email from July 5 through July 6, 2012, from Weatherby to Toni, with information about the medal ceremony. (Tr. 210). Next, Hartwig read an email from July 6, 2012 from Weatherby to Melissa and Toni, with information on the spiritual massage, and an attachment titled, "The Spiritual Love Massage," which Hartwig read and described, and which included photographs of a nude massage in which the person giving the massage puts his hands on the genitals of the person getting the massage. Hartwig testified that she also saw the attachment on "defendant's computer." (Tr. 212-216).

Hartwig read another email from July 6, 2012, in which Toni and John agree that they will see each other the following day, and discuss the information that Weatherby sent about the ceremony and the massage. (Tr. 218).

Hartwig read another series of emails between McCarthy and Toni, in which McCarthy recited a list of things that Toni must do now that she is a Novata, including take photos and set up a boy for training. (Tr. 220). Hartwig also read an email between Weatherby and Toni, in

12

which Weatherby wrote that John would have his hands all over Toni's naked body for the massage, and noted that Toni would likely "climax one or more times." (Tr. 221).

Agent Hartwig read an email between Ti Twindall and Toni. In that email chain, on July 7, 2012, someone purporting to be Toni's angel, Theresa, commented "about the photos John took" of Toni and remarked that Toni had "developed some stretch marks" on her buttocks and thighs. (Tr. 224).

Hartwig read an email from July 9, 2012, between John and Toni, in which John wrote that he was working on Toni's webpages, and commented that they were going to look nice with Toni's "full breasts." (Tr. 229). In another email on the same date, Toni wrote that she wanted to see the website when it was done, and John responded that she would be the first to see it, and that there were some shots he wished he had taken, for example on her back with her legs together and raised. (Tr. 230).

Agent Hartwig read portions of an email from July 9, 2012, between Weatherby and Toni, in which Toni indicated that Margarita asked if Toni had taken her nude photos for training. (Tr. 230). Hartwig also read portions of an email chain from July 11, 2012, between John and Toni, in which John wrote that "the boy" wanted to come at 4:00 the next day, and that John could get Melissa and Toni early, and "you could get your massage." (Tr. 233)

Agent Hartwig read an email from John to Toni on July 11, 2012, in which John wrote that he put together seven pages for Toni's website, somethinnice.com, and gave a user name and password. Agent Hartwig testified that she went to the website, and saw "a birthday cake." (Tr. 235). In another email on July 11, 2012, Toni wrote that she liked the website, and commented that she looked like she was in paradise, and referenced an ice cream cone. John referenced what was presumably a photo, in which there was a cat staring at Toni's "butt." John wrote that he

added a chat room to the website. Hartwig was asked whether she found "naked sex-explicit photos of Toni on the computer taken from the defendant's phone," and she responded that she did, including photos that could have been Photoshopped. (Tr. 236).

Agent Hartwig next read an email between Amity Shaw and Toni from July 13, 2012, in which Shaw suggested, among other things, that Toni tell John how she would like him to perform oral sex, in explicit detail. (Tr. 237-242). In addition, Hartwig read an email chain from July 12, 2012, between Weatherby and Toni, in which they discussed the fact that Toni "did not have an opportunity to train." (Tr. 248).

Agent Hartwig next read an email between John and Toni from July 14, 2012, in which John wrote, "we have a guy to train on Tuesday. He is a 16-year-old virgin. He has been emailing us for about two years. He was on MySpace with us before that. You and Margarita will train him. He is a nice boy and heavy into motocross racing. He got hurt last year and has his own website on motocross." Toni responded, "Yeah, I seen Maye's text message."(Tr. 249).

In another email on the same date, John provides a link to the facebook page of an Eddie Kline. (Tr. 250). Hartwig located Kline, and obtained his emails, which were admitted, without objection, as Government Exhibit Yahoo Disc 2, and Government Exhibits EK Emails 1 through 5. (Tr. 250-52). The Kline emails were between Kline and Margarita, from the time period of July 12-14, 2012. (Tr. 251).

Finally, Hartwig read an email between Weatherby and Toni, from July 16-17, 2012, in which Toni expressed feeling bad seeing her mother cry, and for lying to her mother. Weatherby suggested that Toni's mother was being used by the devil, and suggested that Toni erase "these emails too." (Tr. 254-55).

Agent Hartwig testified that the FBI found a document referencing Easy-Hide in Gabriel's home that suggested Gabriel had an account with Easy-Hide, and there was an Easy-Hide icon on a computer that Hartwig observed during the search, and of which agents took a photo. Hartwig identified "mejohng@yahoo.com" as Gabriel's email account that he used to communicate with her after the FBI searched his home. (Tr. 259-262).

Hartwig was asked if she found "anything connecting a mejohng handle with Easy-Hide," and she answered that the FBI did an "open source search" for "mejohng" and found that "he had posted about how much he enjoyed Easy-Hide as a product." (Tr. 262-63). Hartwig testified that Easy-Hide prevented the FBI from being able to pinpoint a physical location for a particular IP address, and identified information that established that Gabriel had an account with Easy-Hide. (Tr. 264-65).

Agent Hartwig next testified that she found letters in the search warrant "involving Di," and that she recognized Government Exhibits Di Letter 1-3 as those letters. In those letters were "references to the same or similar type of content in the emails sent to Toni." (Tr. 270). The letters were admitted without objection. Hartwig then confirmed that "Crystal Marie" was a real person, and read from the letters, sent from "Di." (Tr. 271). Hartwig read portions of the letters, including sections that refer to being a priestess, and holding hands with John and getting "love energy." The letters also refer to "Maye" as being a priestess. (Tr. 273).

Next, Agent Hartwig testified that she found "naked pictures of Toni" on one of Gabriel's computers. (Tr. 274). Hartwig identified furniture that she saw in Gabriel's home in one of the Toni photos, and some photos of Toni that appeared to be Photoshopped. (Tr. 278-80). The parties stipulated that the computer the photos were found on was manufactured in Mexico. (Tr. 282).

On cross-examination, Agent Hartwig confirmed that Melissa and Toni are sisters, that Margarita is Toni's older cousin, that John Gabriel is in his 70s, and that Maria "Cuca" is Toni's aunt, who is older than Toni. (Tr. 283). In the emails that Hartwig reviewed there was discussion that Melissa, Margarita, and Maria were all participants in the program. (Tr. 284). Hartwig agreed with defense counsel "that there is no" Di McCarthy, Sarah Weatherby, Kelly Meirs, Amity Shaw, Marie Stennis, or Trudy Cohms. (Tr. 284-85).

Agent Hartwig confirmed that in a previously played recorded call between Gabriel and Margarita, Gabriel said that he wrote a letter that was found by the FBI, and in that letter "he pretended to be someone named Di McCarthy, or Di." (Tr. 286). In that call, Gabriel did not say that he pretended to be Di to entice Margarita or anyone else to have sex, or to entice anyone to take any sexual photos. Gabriel did not say anything about a program for sex, he told Margarita that he pretended to be Di so that Margarita would take his advice to save money and buy a house. (Tr. 286-87).

When the FBI executed a search warrant on August 16, 2012, both Gabriel and Margarita were home. During the search, Hartwig saw papers near the computers, with passwords handwritten on them, including one that also had "Easy-Hide" written on it. The FBI did not obtain a handwriting sample from Gabriel, or analyze the handwriting on the piece of paper. (Tr. 288). Hartwig was shown defense photos of Gabriel's home that were taken during the search. Those photos showed, among other things, a piece of paper next to one of the computers that had user names and passwords written on it, and a piece of paper that also had "mejohg@yahoo.com" with user names and passwords on it. The FBI did not compare the handwriting "that we see here in this photograph" to a known sample of Mr. Gabriel's handwriting. (Tr. 290-91). The FBI did not attempt to recover fingerprints from the computer on

which it found the photos of Toni. The FBI seized Margarita's iPhone and found the word "novata," which had come up in the emails to Toni, "mygirls4god," which was the "handle" that Sarah used, and "mejohng," which was the handle used for the Easy-Hide-IP anonymizer account, and is also associated with Gabriel's email. (Tr. 292-95).

Agent Hartwig agreed that the letters to Crystal and Margarita were from guardian angels who do not exist. (Tr. 295). Toni's mother provided the FBI with a letter that was purportedly from an angel, which the FBI tested for fingerprints but recovered none, including none of Gabriel. (Tr. 296). The FBI interviewed Joshua Perez, who was dating Margarita in the summer of 2012. Hartwig read many emails between Perez and Margarita, including one in which Perez referred to Margarita as his "spiritual mate." (Tr. 297-98). Agent Hartwig did not think Joshua Perez liked John Gabriel. (Tr. 298). The FBI found a condom in one of the bedrooms during its search of the house on Monmouth. John Gabriel is in his mid-to-late 70s. (Tr. 299).

On re-direct, Hartwig testified that she had reason to believe Gabriel knew he was being recorded during the call with Margarita. Hartwig also identified a "green item" sitting on top of one of the computers in the search warrant photos as "Serif Webplus," which was on top of a different computer than the one that the photos were found on. The photos of Toni were found in an electronic folder titled, Weekly Reporter." (Tr. 305-06).

On re-cross Hartwig testified that the lower-level living room where the computer with the Toni photos was located was an unlocked room. The FBI did not take fingerprints in the house. (Tr. 307).

### Michael Theis

Michael Theis, a forensic examiner for the Chicago Police Regional Computer Forensics Laboratory (RCFL) testified, without objection, as an expert. (Tr. 315) Theis processed computer

hard drives provided to him in this case, recovered deleted files off of the computers, and put the files up for review for the case agent. (Tr. 317). In this case, Special Agent Ingri Hartwig reviewed the hard drive, bookmarked things that she considered to be of evidentiary significance, and returned the disc to Theis, who created a forensic report of everything selected. (Tr. 319). Government Exhibit RCFL Disc was admitted without objection. (Tr. 320).

Theis testified that "created date" is the date the document was created, and "modified date," is the date the file was last changed or altered. (Tr. 321). Path is where a file was located on a computer. (Tr. 322). These images were stored in the user directory "for Weekly Reporter in their AppData under a program called Serif Webplus, version 13." This does not tell whether or not this image was viewed on the Internet. (Tr. 322). Government exhibit Toni 1 resembles RCFL 1; RCFL 2 was stored in a similar folder and resembles Toni 2, which has a created date and a modified date of July 12, 2012. The modified date does not indicate whether or not someone viewed the photo, so it could have been viewed on July 13, 2012 and that would not be reflected here. (Tr. 323). RCFL 3-8 resemble Toni 3-8, respectively, and were all created on July 12, 2012. (Tr. 323-25). RCFL 9 was a "carved" file, which means it was a residue extraction photo, which means the photo was deleted and that it had to be recovered by Theis. (Tr. 326). RCFL 9-44 are carved files. Some of the carved files resemble images contained in the attachment to Government Exhibit 66-B. (Tr. 325-335).

Theis testified that SerifPlus is a web design application that is stored locally on the computer and used to develop web pages for the Internet. It could be used to develop something like Government Exhibit Email 66-B. (Tr. 336-37).

On cross-examination, Theis testified that he recovered sexually explicit photos from one of the three computers he examined in this case. (Tr. 336). Theis examined two black Hewlett-

Packard desktops, and one Toshiba laptop, but not a tan Hewlett-Packard computer. (Tr. 337). Of those three computers that he examined, Thies recalled recovering sexually explicit photos from one. (Tr. 338). The files were in a folder called Weekly Reporter. The Serif Webplus program was in the folder in Weekly Reporter under AppData, so the app that was stored by that program was stored under Weekly Reporter. Therefore, if data is stored in that folder, it is because that is the default of the program itself. (Tr. 338). Theis's examination told him that someone had stored photos in that computer at some point, but he has no forensic method for telling who was sitting at the computer when those files were loaded on the computer, and no forensic method for telling who deleted the files. (Tr. 338-39).

### Katherine Rinehart

Katherine Rinehart, the Director of Billing for Endurance International Group, a web hosting provider that owns iPage, has approximately 4 million subscribers. (Tr. 340). iPage offers various website services, and a customer can buy a package that allows them to create their own website. After a new customer provides their name, contact information, and billing information for registration, the only thing required for the annual subscription is a valid payment method. (Tr. 342). Customers can purchase email packages, and can create and delete email addresses at their discretion. (Tr. 343). Rinehart was shown Government Exhibits iPage 1-4, which are subscriber records for iPage account "me John G., Jr." (Tr. 344). The records were admitted without objection. The account was opened on May 1, 2011 and closed on September 29, 2012. (Tr. 346). The name of the subscriber was John Gabriel, with an email address of "mejohng@yahoo.com." (Tr. 347). The domain name "somethinnice.com," was registered with this account. (Tr. 349). The email account "yes@idu2.com was added and removed on July 19, 2012. (Tr. 351). Domain privacy, which is a service that allows iPage to hide the contact

information for a domain owner from the public, was purchased for Gabriel's account, starting in 2011. (Tr. 353). Gabriel registered the domain name "idu2.com," in December of 2011. (Tr. 357). The customer added "me@idu2.com," and "administrator@idu2.com," on January 5, 2012. Government Exhibit Email 58, sent from ""administrator@idu2.com," was not sent from iPage. The customer added the mailbox "john@idu2.com," on June 22nd, 2012 and removed it on July 16, 2012, added mailbox "yes@idu2.com," on July 4th, 2012 and removed it on July 16, 2012. (Tr. 357-59). The address "me@idu2.com," was removed on July 18, 2012. Domain privacy was purchased for this domain on December 30, 2011. (Tr. 360).

On cross-examination, Rinehart admitted that she has never met John Gabriel. In 2011 through 2012 there was an iPage customer using the member name ipg.itsjohn. (Tr. 360). The person who is creating the websites through the system is not necessarily the same person who is signing up on the billing. iPage has the content of a website while an account is active, but once it is deleted, they no longer have the content; Rinehart has no information about what was on any of these websites that were created through their system. (Tr. 361).

### Eddie Kline

Eddie Kline testified that in 2012 he was 15-years-old and used the email eddiekline@yahoo.com. (Tr. 362). Kline started communicating via MySpace with Margarita around 2005, and then later switched to email because Margarita said she wasn't going to have her MySpace anymore. (Tr. 364-65). At first they just chatted about casual stuff, then Margarita brought up sex. (Tr. 365). When they started chatting Kline was around 8-years-old; Margarita brought up sex when Kline was around 10-years-old. Kline told Margarita how old he was. (Tr. 366-67). Margarita emailed with Kline about sexual positions, and eventually asked Kline if he wanted to have sex with her. They were supposed to have sex at Margarita's house in Joliet,

where she lived with her grandpa. (Tr. 368). Kline arranged to have sex with Margarita around 10 times, but then didn't follow through. (Tr. 369). Kline was shown a series of emails, which had been previously admitted through the Yahoo witness, in which the two discuss getting together to have sex. (Tr. 370). In another email, Margarita used the address me@idu2.com; Kline said she would change her email addresses to a different email "like every conversation," because somebody hacked into her accounts. (Tr. 373-74).

Kline identified an email from Friday, July 13th, 2012, in which Margarita wrote, "this is my cousin Toni. She could join us on Tuesday." There was a nude photo attached to this email, of a person that Margarita said was her cousin Toni. (Tr. 375-76). In a later email, Margarita describes in "somewhat graphic detail," sexually, what she expected would happen with Kline and her cousin Toni. (Tr. 376). On Saturday, July 14, 2012, Margarita sent an email that suggests that Kline will have sex with "Toni with her big boobs and me," "on Tuesday." (Tr. 377). Kline did not end up having sex with Toni, because he "just never showed up to the meet." (Tr. 378).

On cross-examination, Kline testified that in the summer of 2012, he had a series of email exchanges with someone who identified herself as Margarita in which they discussed motocross, her friends, his friends, and sex. Kline did not know Margarita's grandfather's name, and never met him. (Tr. 381). Kline had never met John Gabriel, never had a conversation with Gabriel, nor exchanged emails with Gabriel. (Tr. 382).

On re-direct, Kline testified that he had never met Margarita, he had only seen photos of her. (Tr. 382).

### Antonia "Toni" H.

At trial, Toni testified that she met John Gabriel when she was around 4 or 5 years old, and did not see him again until she was 17 years old, in 2012. (Tr. 391). Toni started spending

21

time with Gabriel because "he started talking to my older sister again, Melissa, and he started coming around." (*Id.*). When she was 4 or 5, Gabriel told Toni that she had an angel named Theresa; the angel Theresa was identified through the use of a Ouija board by Toni, Gabriel, and Toni's mother, her aunt Maria "Cuca" Davila, her grandparents, and Margarita Hernandez. (Tr. 394). Gabriel told everyone in her family that they had angels. (Tr. 395).

Toni did not know Sarah Weatherby before she received Government Exhibit Email 1, (Tr. 393-94), and she did not know that her sister Melissa knew Sarah Weatherby. (Tr. 396). Toni testified that she emailed with Weatherby because "she was someone that [she] was able to talk to." (Tr. 396). Toni did not talk with her sister Melissa at that time, because they were not as close as they "used to be." (*Id.*). Toni felt she should talk to Gabriel more because Melissa was talking to him and wanted Toni to "talk to him also," and then Sarah was also telling her that she should talk to Gabriel, so she "might as well have tried." (Tr. 399).

Toni thought "it was strange," when she read an email from Weatherby telling her to spend more time with Gabriel because Weatherby was someone that she "didn't really know too much talking highly about John," which changed Toni's opinion of Gabriel "a little bit." (Tr. 400). When Weatherby advised Toni to stop talking to Toni's ex-boyfriend she did, "somewhat," because Weatherby told her to, and because she "also kind of didn't want him back." (Tr. 402). A few moments later Toni was shown Government Exhibit Email 11 and again asked if she stopped speaking to her ex-boyfriend "as a result of Sarah," to which she answered, "Yes." (Tr. 403-404).

Toni received an email from Weatherby, in which Weatherby instructed Toni to email "John" at a special email, john@idu2.com. Toni exchanged emails with the person at that address, and she "just figured it was John." (Tr. 403).

Toni sent an email to Weatherby in which she wrote that her mother was thinking of moving, which made Toni upset as it would take her away from "Melissa and Emery," Melissa's daughter. (Tr. 403).

Toni testified that Gabriel told her in person that Weatherby was an angel, and that Gabriel told her in person what priestesses and spiritual mates are, and what they do. (Tr. 405).

In an email dated July 1, 2012, Toni wrote to Weatherby that she received her "medal" that day. Toni testified that Gabriel gave it to her in person, when they were alone at Gabriel's house. (Tr. 407).

Toni testified that she received written instructions on what to do with the medal in an email she received on July 1, 2012 (Government Exhibit 31), from a person named Di McCarthy; Toni did not know who Di McCarthy was. (Tr. 409). Toni followed the instructions. (Tr. 410). Toni also received a "program summary" from McCarthy, which she read. (Id.). At this point in the testimony, the prosecutor read from the summary, which Toni described as "weird," and "crazy," and testified that this summary was the first time she was told about the sexual aspect of the program. (Tr. 412-416). In that email thread, Toni first learned that she could potentially be a "Novata," but she was not interested in it, because she "thought it was crazy to have sex with other guys that [she] didn't know." (Tr. 416-17). Toni understood that it was her choice whether or not to participate in the program. (Tr. 417). McCarthy wrote of a wealthy man who purchased seeing eye dogs for the blind for "every time Margarita or a couple other priestesses train a guy," and told Toni that Weatherby saw Toni as a "special soul," which was "something nice to hear." (Tr. 418-19).

23

Toni testified that her feelings about the program that involved having sex changed over time because she started to receive emails from "different other girls" from "around the world," who told her that it was a great opportunity. (Tr. 421).

On July 3, 2012, Toni received an email from "Kelly Fisher," who wrote that she was a "level 7 priestess" in Canada. Fisher wrote that she had a friend interested in the novata position in Chicago, where there was only one priestess – Margarita. (Tr. 423-24). This email was the first time Toni "found out" that Margarita was a priestess, which she thought was "crazy." (Tr. 424). At that point, Toni understood that a priestess is someone "who had sex with younger guys" in order to "keep them away from like bad things and the devil and help them do good." (Tr. 424). Toni received additional emails that made her feel like she should agree to become a novata. (Tr. 425). When she learned that her aunt "Cuca" was a novata, the decision to become a novata was easier, and the program seemed more legitimate. (Tr. 426-27).

In an email dated July 3, 2012, Toni asked John if he could make himself available the upcoming Saturday, because Weatherby told her that she needed to have a ceremony to put her medal around her neck; according to Toni, the ceremony took place on Saturday, July 7, 2012. (Tr. 428).

Toni testified that she saw "pictures of [Margarita] naked in different poses on "Margarita's website" on the internet. (Tr. 429). Toni identified Government Exhibit RCFL 43 and RCFL 44 as being two of the pages that she saw on Margarita's website in July of 2012. (Tr. 429-30). Toni testified that Gabriel was able to change Margarita's website "into a recipe so no one can see her naked pictures," but that Toni had a password to allow her to see it. (Tr. 430).

On July 4, 2012, in an email to Weatherby, Toni wrote that she would accept being a novata, which meant she agreed to participate in the program. (Tr. 431). Toni accepted because

she was thinking about "how other women wanted the opportunity, so [she'd] rather take it than they do." (Tr. 431). Toni knew that once she said yes to being a novata, that she would have to take photos like Margarita did, for her own website, and that Gabriel had to take them because he was the spiritual mate. (Tr. 431). Toni knew that Gabriel would be her spiritual mate, because he was Margarita's spiritual mate. (Tr. 432).

Toni received an email on July 6, 2012 from Weatherby that contained an attachment describing the medal ceremony. Toni testified that the medal ceremony she experienced was different than what was described in the attachment because there were no angels present – it was just Toni, Gabriel, and Toni's sister, Melissa. Margarita was not present. (Tr. 433).

Toni testified that the ceremony took place at Gabriel's home. (Tr. 435). Melissa also had a medal ceremony the same day. (Tr. 435). Toni testified that on the same day as the medal ceremony, July 7, 2012, Gabriel took photos of her and her sister in the living room of Gabriel's house. (Tr. 435-36). Toni stated that Gabriel told her to take off her clothes, and told her how to pose. Melissa had her photos taken after Toni. (Tr. 436).

Toni testified that she saw the photos Gabriel took of her that same day. Toni stated that Gabriel took the photos with a camera, connected the camera to a computer, loaded the photos on to the computer, and showed her "a few, like maybe three" photos. (437). Toni identified Government Exhibits Toni Photos 1 through 8 and Government Exhibits RCFL 18 through 42 as photos that Gabriel took of her on July 7, 2012. Toni testified that she saw a webpage that Gabriel created for her at "somethinnice.com," which was "like Margarita's," and had "naked pictures" of her with "different cartoons like on the beach and stuff." (Tr. 440). Toni identified "Toni Photo 6" as one of the photos she saw on the website. (Id.).

25

Toni testified that she was supposed "to have sex with a boy and then also get a message (sic) from John," on July 12, 2012. Toni did not have sex with the boy that day, because she "believe[d] it was canceled," but she did get her massage. (Tr. 441).

Toni was shown an email with an attachment that provided information on spiritual massage. Toni testified that Gabriel gave her the spiritual massage, at his house. Melissa also got a spiritual massage that same day, right after Toni. Margarita was not in the house that day. (Tr. 443). Toni described the massage, and stated that Gabriel digitally penetrated her during the massage. (Tr. 444). After the massages, Toni, Melissa, and Gabriel sat on the couch watching TV and first Toni, then Melissa, massaged Gabriel's genitals. (Tr. 445).

Toni testified that on July 14, 2012, she received an email from John, in which he advised that "we have a guy to train on Tuesday, and he is a 16-year-old virgin." (Tr. 445). Toni testified that the email was sent from John because he was her spiritual mate and he was supposed to find boys for her to train. In the email, there was a link to Eddie Kline's facebook page. (Tr. 446). Toni saw the facebook page for Eddie Kline, but she did not meet Kline for sex, nor did she ever email him. (Tr. 446). Toni first testified that she never met any boys to have sex, because she came up with an excuse to get out of it. Upon further questioning, Toni testified that her mother "found out" so she never had sex with any boys. (Tr. 447). Toni's mother told Toni and Melissa after she made a police report. (Tr. 447).

On July 17, 2012, Toni sent an email to Weatherby, and expressed that she felt bad lying to her mother about the secrets she was keeping from her, "everything that was happening with John and Margarita." (Tr. 448). Weatherby suggested that Toni "erase these emails too." (Tr. 448). Toni did not follow the suggestion, but she did erase some of her emails. (Tr. 448). Toni never met any of the women who had sent her emails. (Tr. 449).

On cross-examination, Toni acknowledged that she was taken advantage of in the summer of 2012. (Tr. 450). Toni acknowledged that when the Ouija board was used when she was 4-years-old, Margarita, Melissa, her aunt Maria, her mother, her grandfather, and her grandmother were all there. They used the board "to communicate with the angels that John had told us about." (Tr. 452).

After Toni received the first email from Sarah Weatherby, she just started emailing back. (Tr. 452). Melissa told her that Weatherby was someone she talked to, but Toni didn't think anything of it at the time. (Tr. 453). Toni testified that Melissa never talked with her about the program. Later on, Toni and Melissa talked about taking photographs, and about the novata program, though Toni could not recall any specifics about their conversations. (Tr. 453). Toni never talked to her Aunt "Cuca" about the program. (Tr. 453). Toni learned that Cuca was part of the program, but she wasn't able to ask Cuca about it, because it was supposed to be a secret. (Tr. 454).

Toni had never visited Margarita's house on Monmouth prior to the summer of 2012. (Tr. 454). Toni did not talk to Margarita on the phone, and did not have Margarita's cell phone number. (Tr. 454). Toni did not recall talking to Margarita on a weekly basis in the summer of 2012. (Tr. 454). After Toni learned about priestesses and found out Margarita was one, Margarita "told me what level she was at and how great it is and she was going to heaven." (Tr. 455). Margarita told Toni that as a priestess she had sex with younger boys, but did not talk to Toni about the program. (Tr. 455). Margarita was at the house on Monmouth "maybe twice in the beginning, and then it was always just John there." (Tr. 455). Margarita never asked Toni why she was at the house, and "John had told me that she pretty much knew what was going on." (Tr. 456). Toni did not tell Margarita that she was going to get a massage. (Tr. 456). Toni had not

told her mother that she was emailing with "any of these angels" before her mother found the emails. (Tr. 456). Toni's mother was not mad when she found the photos, but Toni "felt really bad because she was crying." (Tr. 456).

Toni's mother asked if Margarita was involved in the program "after she found out." (Tr. 457). At that point, Toni told her mother "everything that happened and what was involved." (Tr. 457). When asked if she recalled telling law enforcement that Margarita was present when the photographs were taken, Toni first responded "no." When asked again, Toni responded, "I - - well, no. I meant that she wasn't there." (Tr. 457).

### Joshua Perez

The defense called Joshua Perez as its first witness. Perez was the live-in boyfriend of Margarita Hernandez – the pair lived at the home on Monmouth Drive, in which Gabriel used to live with Margarita. (Tr. 460). Perez started dating Margarita in March of 2012. (Tr. 462). Perez went to Gabriel's house on July 9th, 2012, "with a letter, a bike, various personal belongings." Perez gave Gabriel a letter, and Gabriel opened it up in front of Perez. Perez wrote the letter on Microsoft Word and copied and pasted photos in to the letter. (Tr. 463). In the letter, Perez was trying to tell Gabriel the truth about what Perez was doing with Margarita. (Tr. 464). The government objected on hearsay grounds, and a lengthy discussion was held at sidebar. In that discussion, defense counsel admitted that one of the things they were attempting to set up was a theory that Perez had motive and opportunity to have set up Gabriel in this case, in order to get Margarita for himself. The government suggested that by so doing, he also set up his girlfriend Margarita, and raised the possibility that they would then elicit testimony related to Hernandez's pending statutory rape case. Defense counsel responded, "That's fair game," and had no objection to that line of cross. (Tr. 466-467).

Perez admitted that with the letter he was trying to let Gabriel know that Margarita was involved with him, and that she told him she loved him (Perez). (Tr. 471). Defense Exhibit Perez Letter 1 was admitted, and Perez testified that he handed that letter to Gabriel, and also sent it to him by email. (Tr. 472-73). In the email, Perez wrote that he and Margarita "committed sin," in Gabriel's home. (Tr. 473). Perez found out through google that Gabriel and Margarita lived together. (Tr. 476). Perez and Margarita communicated a lot in the summer of 2012, sometimes about religion, including whatever Bible verse came up in Perez's AA meetings. (Tr. 477). Counsel showed Perez texts that he sent to Margarita of various Bible quotes, and pointed out that in the July 9, 2012 letter Perez wrote that they "committed sin," meaning they had sex. (Tr. 478).

Counsel showed Perez a text in which Perez wrote to Margarita, "I did pray, my pretty spiritual mate, smiley face." (Tr. 480). Perez moved in with Margarita in October 2014. (Tr. 481). Perez communicated with various law enforcement agencies and prosecutors involved in this case, including Agent Hartwig. (Tr. 481). In Perez Email 1, Perez wrote to the Will County prosecutor and suggested that he seek information from a web hosting company related to "the emails sent to minor from me@idu2.com on 7/10/2012 received in the minor's gmail in-box," and other research that Perez got from the internet. Perez got the information by googling Gabriel's name and address. (Tr. 482). Perez accessed a search service that provides information on who owns websites. (Tr. 484).

Perez saw Gabriel as an obstacle to Margarita getting on with her regular life. Perez did not "know a lot about those iPage accounts," he just googled Gabriel's name and address. (Tr. 486)

On cross-examination, Perez testified that he used FastDomain or GoDaddy – one of the

search services to see if a domain is available for purchase. (Tr. 486). Perez believed that the
"me@idu2" email address was not Margarita's, he believed it was Gabriel's "because it's his
website." Perez did not know Margarita to be proficient with computers, she only used her cell
phone for "typical Pinterest, Facebook -- I mean, I don't think she has Facebook, but Pinterest,
just your normal browser searches." Perez only saw Margarita use the computer to pay bills. (Tr.
488). When Perez started dating Margarita in March 2012, he did not know that she lived with
Gabriel. Perez never had an account with Easy-Hide, and the only time he dealt with iPage was
when he was researching idu2.com. Perez did not know Maria Davila, Melissa Hernandez,
Sandra Hernandez, or Toni H. Perez never took photos of Toni. (Tr. 493-94).

On re-direct, Perez clarified that when he googled Margarita Hernandez and her address,
her name and Gabriel's name came up. (Tr. 494). After Perez found out Margarita was with
Gabriel, he would get mad to see her checking her phone or to answer her calls in secret.
Margarita usually had security on her phone but when she did not, Perez would check her phone
and it would be Gabriel. Perez believed that in the summer of 2012 Margarita Hernandez loved
him. (Tr. 495).

On re-cross, Perez confirmed that he started checking Margarita's phone in the summer
of 2012. (Tr. 496).

### John Gabriel

On direct, John Gabriel provided information on his personal and professional
background, and the circumstances of how he met and came to live with Margarita Hernandez.
Gabriel testified that over the years he has known Margarita, he has given her "every cent" that
he had, and that she is "worth $451,500" because of Gabriel. (Tr. 514). Gabriel lived with
Margarita at the Monmouth house as a renter, paying $500 per month in rent. Until the FBI

search, Gabriel worked as a newspaper reporter; he then discontinued publication. (Tr. 518). Gabriel met Joshua Perez in July of 2012, and did not know that Perez and Margarita were dating. Gabriel did not read the letter Perez gave him, he gave it to Margarita. (Tr. 519).

Gabriel testified that he used the pseudonym "Di," not Diane McCarthy, but Diatra, in a book he wrote called "Beyond the Invisible Wall." Gabriel used "Di" from around 1998 to 2002, in a guise similar to Ann Landers or Dear Abby, to gather information to complete his book. (Tr.520). Gabriel never wrote emails using the names Diane McCarthy, Sarah Weatherby, Marie Stennis, Amity Shaw, or Trudy Cohms. (Tr. 521).

In 2012, Gabriel believed that his computer was being hacked when folders suddenly started to disappear on his screen, and he reported the issue to Webroot and Microsoft. Gabriel described the procedures that a representative of Microsoft advised him to use, but nothing worked. (Tr. 521-22).

Gabriel admitted that he knows Toni, but denied that he ever took a sexual photo of her, and denied that he ever gave her a sexual massage. (Tr. 523).

On cross-examination, Gabriel testified that he previously owned a Compulab store, and that he worked for a time as a paralegal for a prominent attorney in Chicago. (Tr. 53-31). Gabriel ran a newspaper "The Weekly Reporter," and wrote articles on the computer. (Tr. 532). Gabriel wrote articles on Government Exhibit Computer, and created a folder "Weekly Reporter." (Tr. 533).

Gabriel was asked about Margarita's employment, and whether she is still a customer service supervisor, to which Gabriel replied, "She's on administrative leave, but she still has her job, yes." The government then asked, "and she is on administrative leave because she was charged with another crime herself?" Gabriel responded, "Yes, someone who involved me also

involved her." The government asked, "And it involved her having sex with young boys?" Gabriel responded, "That's what they said, yes," and confirmed that the case was in Will County. (Tr. 534).

Gabriel testified that he has known Toni since she was in grammar school, and knows her sister Melissa and her mother, Sandra. (Tr. 534). Gabriel admitted having interactions with Toni and Melissa when they were young, and denied ever using a Ouija board. (Tr. 536). Gabriel admitted that he wrote a book about an angel, but denied writing to Toni as angel Sarah Weatherby. (Tr. 537). Gabriel admitted having Easy-Hide accounts, and clarified that they were paid for by credit card through Paypal. Gabriel used the Easy-Hide account for the Weekly Reporter, to conceal his investigations as a reporter. (Tr. 538). Gabriel testified that it was not a "coincidence" that Weatherby and McCarthy had Easy-Hide accounts; there are many Easy-Hide customers. (Tr. 540). Gabriel believed that Joshua Perez and the Hernandez family were trying to get him out of Margarita's life. (Tr. 541). Gabriel admitted that he opened the "john@idu2.com" email account "at some time," but denied that he was the person sending emails to Toni from that account. (Tr. 543-45).

Gabriel was only alone with Toni one time, in July 2012, when he took her to the Middle East Wall in Marseilles, Illinois. (Tr. 547). Gabriel denied ever taking Melissa and Toni to his home, denied telling Toni to get undressed, and denied taking naked photos of Toni. Gabriel admitted that he took naked photos of Margarita early in their relationship. (Tr. 549). Gabriel did not believe that Margarita was part of the plan to get rid of him. (Tr. 549). Gabriel was surprised by the fact that there were hundreds of nude photos of Margarita, as well as nude photos of Toni and Melissa, on a computer that he used. (Tr. 550). Gabriel admitted that he wrote a book, "Beyond the Invisible Wall," and used "personal services" as the name of a mailbox to receive

letters that he received while doing his research for the book. (Tr. 551-52). Gabriel admitted that he wrote the letter from "Di" to Margarita, and described some of the contents of his book, including that "Ti," "Di," and "Sarah," were characters in the book. (Tr. 553-55). Gabriel explained that in the letter to Margarita, he was "trying to excite her emotions to make her write back and give [him] something," that he could use in his book. (Tr. 557).

The government read portions of a letter purportedly written by Crystal Barnabee, and asked Gabriel to confirm that "Crystal is writing that you had a love energy massage with her the same way Toni says you had a love massage with Toni," and Gabriel responded that the Crystal letter said nothing of the sort. (Tr. 562-63). The government read from another Crystal letter and asked Gabriel to confirm that Margarita had been mad at him because he "had a love energy massage with Crystal," and Gabriel responded that that was a lie, and that Crystal Barnabee was "taking cocaine." The Court stopped Gabriel, and sent the jury out. The Court admonished Gabriel to answer questions narrowly, without trying to interject inadmissible information. (Tr. 564).

Gabriel denied that he set up "yes@idu2.com," for Toni, and denied that he set up a password for the account. (Tr. 569). Gabriel admitted that he owned "somethnnice.com," and that he bought it as an investment to resell. He put a "private chat room for friends and family," on the site, not for Toni. He did not put up a website for Toni. (Tr. 570).

Gabriel denied sending an email as Weatherby telling Toni to erase emails. When asked about the program CCleaner, Gabriel explained that it "ran every night to wipe out the cookies from using the Internet, and that's the purpose of it, to remove cookies that you pick up on the Internet." Gabriel closed some of the iPage accounts because "someone had abused them," and he did not want problems. (Tr. 571).

33

After he was charged in this case, Gabriel called Melissa on the phone several times. Gabriel did not warn Melissa not to speak to law enforcement, he told her to tell the truth. Gabriel told Cuca not to talk to anybody because that is "common sense," and "you may be talking to somebody who will invent things to get themselves out of trouble." (Tr. 572).

Gabriel denied asking Margarita to marry him after he was charged "in order to prevent her from cooperating against [him]," due to spousal privilege. (Tr. 576).

On re-direct, Gabriel confirmed that he kept user names and passwords taped on his computer, or on pads of paper to the side of the computer. The computers were left out in the open when he left the house. (Tr. 577). Gabriel did not know every time that Margarita had taken a naked photo in her life. (Tr. 578). At some point, Gabriel became concerned that somebody was opening and closing accounts with idu2 without his permission. Gabriel was 79-years-old. (Tr. 578).

### Ingri Hartwig – Rebuttal

On direct, Hartwig identified photos that were found on a computer from Gabriel's home. Specifically, Hartwig identified nude photos of Melissa and Margarita. (Tr. 608). Hartwig identified two photos of Melissa as having been taken at Gabriel's home, which photos bore "creation" dates of July 5, 2012. (Tr. 610), and photos of Margarita Hernandez, taken at Gabriel's home, in the same room where photos of Melissa and Toni were taken, which bore "creation" dates in 2010. (Tr. 610-11). A photo of Margarita from 2010 appeared to be Photoshopped. Hartwig confirmed that photos of Toni were Photoshopped. (Tr. 612). There were "dozens" of photos of Melissa on the computer, which bore various creation dates, all in 2012. (Tr. 614-15). There were "hundreds" of photos of Margarita, with creation dates between 2009 and 2012. (Tr. 615). Hartwig heard a phone call between Melissa and Gabriel, which call was

admitted and published to the jury. (Tr. 616-17). During the investigation, Hartwig attempted to interview Melissa and "Cuca," but neither of them talked to her. (Tr. 616).

On cross-examination, Hartwig confirmed that Melissa and Margarita were adults when the photos were taken. (Tr. 618).

## Government Closing

In its closing, the government argued, in relevant part, that Gabriel "preyed upon" Toni's "shyness, her loneliness, and her naivete," and that when Toni agreed to join the program, Gabriel manipulated her into posing for sexually-explicit photos which he then placed on the Internet. (Tr. 631). The government argued that it made sense that Gabriel was the person "masquerading" as the women who sent emails to Toni, because Gabriel was the only person who "benefitted" from the program, by making himself desirable so he could sexually exploit a minor. (Tr. 634). The government contended that if Easy-Hide were not used, it was "very likely that those Yahoo email addresses, IP registrations, would have come back to one address, the defendant's." (Tr. 635). In addition, the government read numerous excerpts of emails sent to Toni, and referenced Toni's testimony, the Crystal letters found in Gabriel's home, the Margarita letter, the Eddie Kline emails, and stressed that the photos in evidence were found on a computer in Gabriel's home.

## Defense Closing

In her closing, defense counsel argued, "if we move past the fictitious emails and the subpoenas, it comes down to what one person said versus what the other person said." (Tr. 655). Counsel argued that it did not make sense that Toni received an email from Weatherby out of the blue, saying that Melissa told her to email, and did not ask Melissa about it, and further argued that Toni and Melissa were not estranged, because Toni testified that on the day the photos were

taken, they were together. (Tr. 656). In addition, counsel argued, it did not make sense that Toni did not talk to her Aunt "Cuca," about the program. (Tr. 657).

Counsel pointed out that Toni's testimony that she never discussed the program with Margarita was impeached by Government Email 101, in which a reference to training a "16-year-old virgin," was made, and Toni responded, "Yeah, I seen Maye's text message." (Tr. 658). Counsel then focused on Joshua Perez, and the fact that in 2012 he did not have a car or place to live, and that Perez, "cracked the case with google." (Tr. 658). Counsel noted that Perez sent emails with an "unusual amount of detail" about the iPage accounts to law enforcement, and was "trying to figure out who is going to charge John Gabriel." (Tr. 659). Counsel reminded the jury that Hartwig testified that during the search there were "passwords flying around," but that "we didn't hear a lot about locked rooms." Counsel highlighted the fact that Perez called Margarita his "spiritual mate" in one text, and that it was odd that Perez was not concerned that Margarita "has sex with underage boys," and was more concerned with the fact that Gabriel lived with Margarita. Counsel pointed out that Perez now has a place to live, since Gabriel has been charged. (Tr. 659-660). Counsel pointed out that Eddie Kline never got an email from Gabriel, and had never seen or met Gabriel. (Tr. 660). Counsel concluded with the following argument: "So as the Court has instructed you, you have to find beyond a reasonable doubt that John Gabriel committed the crime the government has charged him with committing. In order to do that, you got to reconcile Government Email 101, and you got to figure out what is Josh Perez doing with all this iPage information. And you just got to believe that Toni never talked to anyone in her family, including Melissa, who she was riding in the car with, about what they were doing. Ladies and gentlemen, my client, John Gabriel, is old. He is cantankerous. He can't whisper. His colloquialisms are politically incorrect. He was in a relationship with a much

younger adult woman. He gave her a lot of money. He's all of those things, but he is not guilty." (Tr. 660).

## Government Rebuttal

In rebuttal, the government argued the defense story that Perez and the Hernandez family were out to get Gabriel does not add up. That the jury would have to believe that all of the evidence in the case was all part of a conspiracy to set up Gabriel. The government ended its argument by stating, "The defendant is the only person who benefitted. The defendant created this world of priestesses and angels and Novatas for his own sexual gratification. And in that story, he talked about the devil. There is a devil in this story. And that devil is John Gabriel." (Tr. 666).

## Post-Trial Motions

On May 19, 2015, defense counsel filed a motion for judgment of acquittal. (R. 92). In that motion, counsel argued, in essence, that the government's case was based on inference and conjecture. In particular, counsel argued "the government only infers that Gabriel sent the enticing emails to Victim A. However, evidence adduced at trial revealed at least two other people regularly visited or lived in Gabriel's home when the emails were sent. Gabriel's live-in girlfriend, Margarita Hernandez, had unfettered access to the computers at the time." Counsel further argued that Gabriel's concession that he sent a letter to Margarita as "Di" in 2002 did not establish that he authored emails sent to Toni in 2012.

In addition, defense counsel filed a Motion for New Trial (R. 91), arguing that the Court erred when it stated during Gabriel's cross-examination, and in the presence of the jury, that Gabriel was not allowed to speak about certain matters directly affecting the weight of the evidence against him, namely, that Crystal Barnabee was "taking cocaine."

The Court denied both of Gabriel's motions. (R. 101).

## CLAIMS

**II. GABRIEL WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

### A. The Strickland Standards

Defense counsel's obligations under *Strickland v. Washington* and its progeny are well known. Pursuant to the Sixth Amendment of the United States Constitution, every defendant is guaranteed the right to effective assistance of counsel. U.S. Const. Amend. VI. The Supreme Court has established a familiar two-part test to determine if counsel's errors deprived a defendant of this constitutional guarantee.

First, the Court must determine whether counsel's performance fell below an "objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688 (1984). In assessing counsel's performance, "a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Raygoza v. Hulick*, 474 F.3d 958 (7th Cir. 2007). A single oversight by counsel typically does not violate the sixth amendment, as "judges must not examine a lawyer's error (of omission or commission) in isolation." *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) (internal citation omitted). Rather, the Court must "evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks." *Id*.

Second, the Court must determine whether these errors prejudiced the defendant – i.e. "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694. In

determining prejudice, a court hearing an ineffectiveness claim must consider the totality of the evidence before the trier or fact. *Id*. at 695.

In this case, as set forth fully below, counsels' performance at trial fell below an objective standard of reasonableness in several regards, and the evidence presented at trial would have looked significantly different to the jury. But for counsels' errors, the outcome of the trial would have been different, and Gabriel is entitled to relief.

> **B.     Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to object to the admission of Toni's emails under Federal Rules of Evidence 801 and 403.**

Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to object to the admission of emails between Toni and several others, all of whom the government contends were in actual fact John Gabriel, on the basis of hearsay, or unfair prejudice.

On February 12, 2015, defense counsel filed a motion *in limine* to prohibit introduction of evidence without foundation. (R. 53). The government filed a response (R. 61), and the motion was argued to the Court, and denied, on March 2, 2015. (R. 121).

Specifically, defense counsel moved *in limine* to exclude the emails on the basis of lack of proper authentication, because there was not conclusive proof that the emails were sent by Gabriel. (R. 53). In its response, the government argued that, "while the government will present circumstantial evidence that the women do not exist, and thus in context, defendant must have been the sender of the emails, the government is not required to establish the identity of the sender of the emails because that identity does not have any impact on the relevancy, authenticity, or lack of prejudice of those emails." (R. 61, pp.3-4).

The Court denied the defense motion, with its analysis limited to the questions of authentication and relevance. The Court ruled, "The government's proffered evidence that is sufficient for the Court to conclude that there will be evidence presented at trial that is sufficient to support a jury conclusion that Mr. Gabriel authored those emails or, alternatively, that those emails, whether authored specifically by Mr. Gabriel or someone else, were authored by someone for the purpose of furthering Mr. Gabriel's relationship and conduct with respect to victim A. And on either of those bases, the emails would be relevant to the offenses charged." (R. 121, p. 15). The Court was not asked to address the issue of hearsay, or any specific unfair prejudice argument.

At trial, the government laid the foundation for the emails as business records and admitted them without objection through its first witness, a custodian of records for Yahoo. The admission of the emails as business records was improper. *United States v. Jackson*, 208 F.3d 633, 637 (7th Cir. 2000) (Fact that Internet Service Providers may be able to retrieve email that its customers sent does not turn that material into a business record of the Internet Service Provider.)

The government presented the testimony of FBI Special Agent Ingri Hartwig, who read nearly all of the emails into the record. The emails were received in an account registered to Toni H., and had been sent from multiple emails accounts, several of which were purportedly the email accounts of angels or priestesses who said they were involved in the "program" with Gabriel and Margarita Hernandez. Some of the emails were from an email account directly associated with Gabriel, john@idu2.com.

It was the government's theory that many of the statements contained in the emails were true. Those statements included that the "program" existed, that certain women had sex with

underage boys as part of the program, that there were rituals in the program that included sexual touching for energy, that Gabriel was a "spiritual mate" in the program, that Margarita Hernandez was a priestess in the program, that Gabriel "found" young boys for women in the program to have sex with, that Gabriel engaged in a sexual contact with Toni, that Gabriel took nude photographs of Toni, and that Gabriel posted the nude photographs of Toni on a password protected website.

The emails "were not statements made by declarants testifying at trial, and they were being offered to prove the truth of the matter asserted. That means they were hearsay," under Rule 801. *Jackson*, 208 F.3d at 637 (7th Cir. 2000). The Court was not asked to address whether or not the emails were hearsay, or whether they were admissible under an exception to the Rule against hearsay. Without conceding that Gabriel actually was the person that sent the emails from "john@idu2.com," even if the Court were to find that the emails sent from the account "john@idu2.com" were admissible as a statement of Gabriel, we submit that the remaining emails do not fall under any exception to the rule against hearsay, and should not have been admitted.

Further, even if this Court were to conclude that all of the emails were admissible, defense counsel was ineffective for failing to challenge the admission of the emails as misleading and unfairly prejudicial under Federal Rule of Evidence 403. As set forth fully in the Statement of Facts, *supra*, the emails sent from addresses other than "john@idu2.com" contained suggestions (including a pamphlet with photos of unidentified adults) that Gabriel would, and did, give Toni a "Spiritual love massage," while she was nude, that involved touching her genitals. The conduct charged here was not that Gabriel gave Toni a nude massage and

photographed it. The charge here was that, on a different date than that of the purported massage, he took photos of Toni posing nude and posted them on the internet.

Rule 403 requires the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. "Unfair prejudice . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Loughry*, 660 F.3d 965, 969 (7th Cir. 2011). The overwhelming majority of the emails admitted in this case contained information that suggested to the jury that Gabriel committed crimes for which he was not charged. In addition, given the great difference in age between Toni and Gabriel, the jury was likely to respond emotionally to the suggestion that he touched Toni sexually. The prejudicial emails should have been excluded, and it was not objectively reasonable for trial counsel to fail to move for their exclusion.

### C. Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to object to the admission of Eddie Kline's emails under Federal Rules of Evidence 801 and 403.

Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to object to the admission of highly prejudicial hearsay evidence in the form of emails between Eddie Kline and Margarita Hernandez, and testimony of Eddie Kline regarding his conversations with Margarita Hernandez.

The government's theory in this case was that Gabriel set up email accounts under fictitious female names and emailed Toni H. with information about a "program" in which priestesses and novatas had sex with underage boys to help lead the boys down a righteous path in their lives. The government argued that Gabriel and the fictitious women convinced Toni to

join the program, and then Gabriel took sexually explicit photos of Toni in order to post them on a website to attract underage boys.

Prior to trial, the government produced numerous emails between Eddie Kline and Margarita Hernandez, Gabriel's live-in girlfriend. These emails were hearsay, as they were offered to show that a photo of Toni was, in fact, sent to a young boy with the promise of a sexual encounter with Toni and Margarita. In addition, Kline testified that he communicated via social media with Margarita Hernandez for years prior to the emails introduced at trial, and that he told Margarita that he was 8 or 10-years-old when they first started discussing sex, and that he was 12-years-old when Margarita asked him if he wanted to have sex with her. Defense counsel did not move *in limine* to exclude the emails and testimony of Eddie Kline, nor did counsel object to their admission at trial. On cross-examination, defense counsel established that Eddie Kline had never met nor heard of John Gabriel.

The emails "were not statements made by declarants testifying at trial, and they were being offered to prove the truth of the matter asserted. That means they were hearsay," under Rule 801. *Jackson*, 208 F.3d at 637 (7th Cir. 2000). The Court was not asked to address whether or not the emails were hearsay, or whether they were admissible under an exception to the Rule against hearsay.

In addition, as this Court acknowledged during a sidebar on a different evidentiary issue, "the charge in this case is sexual exploitation of a minor, not arranging for minors to have sex." (Tr. 524). Similar to the argument related to emails sent to Toni set forth *supra*, here, even if the Court were to find that the emails are not hearsay, and that they are relevant, they should have been excluded under Rule 403. Rule 403 requires the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury." Fed. R. Evid. 403. "Unfair prejudice . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Loughry*, 660 F.3d 965, 969 (7th Cir. 2011).

The Kline-Margarita emails admitted in this case took the jury on a sidetrack that brought to mind images of an adult woman – Gabriel's live-in girlfriend – soliciting a 10-year-old boy for sex. That Margarita sent Kline a nude photo of Toni compounds the error: there was no evidence to connect Gabriel to the emails sent to Kline. The only reasonable trial strategy for not objecting to the introduction of these emails would have been if counsel argued to the jury that it was reasonable to infer that Margarita took the photos of Toni and subsequently sent one of them to Kline. Counsel did not so argue. The prejudicial emails should have been excluded, and it was not objectively reasonable for trial counsel to fail to move for their exclusion.

### D. Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to object to the admission of Crystal Barnabee's Letters under Federal Rules of Evidence 801 and 901.

Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to object at trial to the admission of letters that were found in Gabriel's home, and purportedly written to an alter ego of Gabriel by Crystal Barnabee, who was on the government's witness list, but did not testify.

Prior to trial, the government moved, under Federal Rule of Evidence 404(b), for the admission of three letters, dated in 2002, which letters were discovered in 2012 at Gabriel's home during the execution of a search warrant. The government contended that all three of those letters were written by Crystal Barnabee, were addressed to "Di," and contained references to "the program." The government's position was that the letters were not hearsay because they

were not offered for the truth. Rather, the government offered the letters to establish Gabriel's identity as "Di."

The government also sought to introduce the live testimony of Crystal Barnabee, in order to "authenticate the letters and to explain the references in the letters to the Program."

Immediately prior to trial, the government learned that Barnabee was on bed rest due to pregnancy, and would not be available to testify. Crystal Barnabee did not testify, and therefore, did not "authenticate the letters." Defense counsel did not object to the admission of the letters, despite the fact that the government offered no evidence to authenticate them.

The government admitted the letters through FBI Agent Ingri Hartwig, without objection. Agent Hartwig testified that the letters were found at Gabriel's home, that Crystal was a real person, that there were references in the letters to the same or similar type of content found in the emails sent to Toni, that the letters were addressed to Di – who the government argued throughout its case was actually John Gabriel – and then read portions of the letters into the record.

Rule 901(a) provides that evidence is admissible if authenticated by "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Authentication can be established in a variety of ways, including by 'testimony of [a] witness with knowledge . . . that a matter is what it claimed to be[,]' Rule 901(b)(1), and by distinctive characteristics such as 'appearance, contents, substance, [or] internal patterns . . . taken in conjunction with circumstances[,]' Rule 901(b)(4)." (internal citations omitted). *United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012). There was nothing offered by the government to establish that these letters were, in fact, letters written by Crystal Barnabee to "Di." The letters were not properly authenticated and should have been excluded.

The letters referenced priestess, and "love energy," and also referenced many of the names of the women who emailed Toni, including "Sarah," the name from which the majority of the emails to Toni were sent. The letters also included references to "John," who the government argued was John Gabriel. During the government's cross-examination of Mr. Gabriel, it became clear that the letters were, in fact, offered for the truth of the statements contained in the letters. During Gabriel's cross, he government read portions of a letter and asked Gabriel to confirm that "Crystal is writing that you had a love energy massage with her the same way Toni says you had a love massage with Toni." The government read from another Crystal letter and asked Gabriel to confirm that Margarita had been mad at him because he "had a love energy massage with Crystal." (Tr. 562-63). The letters "were not statements made by declarants testifying at trial, and they were being offered to prove the truth of the matter asserted. That means they were hearsay," under Rule 801. *Jackson*, 208 F.3d at 637 (7th Cir. 2000). The Court was not asked to address whether or not the letters were hearsay, or whether they were admissible under an exception to the Rule against hearsay.

The Crystal Barnabee letters should have been excluded, as hearsay and for lack of authentication, and it was not objectively reasonable for trial counsel to fail to move for their exclusion, particularly after counsel learned that Barnabee would not testify at trial.

E.    **Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to object to the improper questioning of Gabriel about the pending criminal case involving Margarita Hernandez.**

Movant Gabriel testified at trial.  On cross, Movant Gabriel was asked about Margarita's employment, and whether she is still a customer service supervisor, to which Gabriel replied, "She's on administrative leave, but she still has her job, yes." The government then asked, "and she is on administrative leave because she was charged with another crime herself?"  Gabriel

responded, "Yes, someone who involved me also involved her." The government asked, "And it involved her having sex with young boys?" Gabriel responded, "That's what they said, yes," and confirmed that the case was in Will County. (Tr. 534). Defense counsel did not object to this line of questioning.

The government's theory at trial was that Gabriel was the mastermind of "the program," and that as part of the program, Margarita had sex with underage boys. The defense appears to have been that Joshua Perez somehow framed Gabriel. During the defense case, Perez was called to testify. In an effort to show Perez's bias against Gabriel, defense counsel south to introduce a letter sent by Perez to Gabriel. At a sidebar on the issue, the government suggested that by framing Gabriel, Perez would have also set up his girlfriend Margarita, and raised the possibility that they would elicit testimony from Perez related to Hernandez's pending statutory rape case. Defense counsel responded, "That's fair game," and had no objection to that line of cross. (Tr. 466-467). The government did not ask Perez any questions about Margarita's pending case, but elicited the above-cited testimony from Gabriel.

Under Rule 401, evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 401. Here, the evidence related to Margarita's pending statutory rape case was not relevant to the charges against Gabriel for sexually exploiting a minor in order to produce a visual depiction of the explicit conduct. Gabriel was not charged with taking a photo of Toni and Margarita having sex with underage boys. Even if this Court were to find that the testimony had some relevance to the charges, counsel should have objected to its admission under Rule 403. Rule 403 requires the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury." Fed. R. Evid. 403. "The amount of prejudice that is acceptable varies according to the amount of probative value the evidence possesses. '[T]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote.'" *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012) (internal citations omitted).

Here, testimony related to Margarita was presented throughout the trial, but apart from vague and unsubstantiated references in Toni's emails to priestesses (including Margarita) having sex with young boys, there was no evidence that the sexual encounters ever actually happened. Moreover, Gabriel was not charged with taking a photo of Toni and Margarita having sex with underage boys. The testimony that the government elicited about Margarita's pending statutory rape case left the jury with the impression that there was, in fact, evidence that there were sexual encounters between Margarita and young boys. Margarita was not on trial in this case, Gabriel was not charged with arranging sexual encounters, and Gabriel was not charged with taking a photo of Toni and Margarita having sex with underage boys. This evidence allowed the jury to speculate – improperly – that there was additional evidence of Gabriel's guilt, perhaps for some other sexual encounter, as the government's theory was that Gabriel "found" young boys for women, including Margarita, to have sex with.

The only possible reason for not objecting to this testimony would be if counsel argued to the jury that it was reasonable to infer that Margarita took the photos of Toni as part of Margarita's scheme to entice young boys – including Eddie Kline – to have sex with her. Counsel did not so argue. There was no strategic reason evident in the record for counsel to not object to this testimony.

### F.  Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to impeach "Toni."

Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to impeach the credibility of "Toni."

The government's position at trial was that Gabriel created multiple personas who emailed Toni about the "program" in order to entice or persuade her to join, and then took sexually explicit photographs of Toni (and her sister) on July 7, 2012, and created a website that contained those sexually explicit photos on or before July 11, 2012, in order to recruit young boys to have sex with Toni and others.

As set forth in the statement of facts, *supra*, on direct, Toni testified that when "Sarah" first emailed her and told her that her sister Melissa told Sarah to contact her, Toni did not ask her sister about Sarah, because she and Melissa were not as close as they had been previously. When asked about this first interaction with Sarah on cross-examination, Toni testified that she did ask Melissa about Sarah, but only knew that Sarah was someone that Melissa also talked to. Toni testified that neither Melissa, not her Aunt Maria "Cuca" Davila ever talked to her about the program. Toni admitted she knew that Davila was in the program, but testified that they never discussed it, because it was supposed to be secret.  However, in one of her first interviews with law enforcement, on July 16, 2012, Toni said that her sister and her Aunt Maria recruited her into the program. (See Exhibit A[4]). Toni was not asked about this contradiction on cross-examination, despite the fact that the vast majority of evidence presented by the government was designed to convince the jury that Toni was lonely and vulnerable, and was therefore seduced by Gabriel into joining the program.

---

[4] Because the Exhibit materials are subject to a protective order, counsel will provide hard copies of these materials to the Court and counsel for the government, and will not file the exhibits on the public docket.

On direct examination, Toni testified that a medal ceremony took place at Gabriel's home. (Tr. 435). Melissa also had a medal ceremony. (Tr. 435). Toni testified that on the same day as the medal ceremony, July 7, 2012, Gabriel took photos of her and her sister in the living room of Gabriel's house. (Tr. 435-36). On February 26, 2015, Toni told Agent Hartwig and counsel for the government that her medal ceremony was on July 4, 2012, which she remembers because it was a holiday. (See Exhibit H). In the same interview, Toni said that she received her "energy massage" a few days after the medal ceremony; at trial Toni testified that she received her energy massage on July 12, 2012. Also during the February 26, 2015 interview, Toni testified that later, on *another* later occasion, Gabriel took photos of her at his house. Toni was not asked about this contradiction on cross-examination.

Also on direct examination, Toni testified that she saw the nude photos that Gabriel took of her on a webpage that Gabriel created for her at "somethinnice.com," which was "like Margarita's," and had "naked pictures" of her with "different cartoons like on the beach and stuff." (Tr. 440). Toni identified "Toni Photo 6" as one of the photos she saw on the website. (*Id.*). On August 13, 2012, Toni told FBI Agent Hartwig that the nude photos were posted on facebook. (See Exhibit B). Again on January 17, 2013, Toni told Agent Hartwig that the nude photos were posted on facebook. (See Exhibit C). Toni was not asked about this contradiction on cross-examination.

On direct examination, Toni testified that she saw the photos Gabriel took of her on the same day they were taken. Toni stated that Gabriel took the photos with a camera, connected the camera to a computer, loaded the photos on to the computer, and showed her "a few, like maybe three" photos. (437). In an interview with the FBI on February 21, 2013, Toni said she did not

see Gabriel download the photos. (See Exhibit D). Toni was not asked about this contradiction on cross-examination.

At trial, defense counsel asked Toni if she recalled telling law enforcement that Margarita was present when the photographs were taken, Toni first responded "no." When asked again, Toni responded, "I - - well, no. I meant that she wasn't there." (Tr. 457). On February 21, 2013, Toni was interviewed by the FBI and told them that Margarita was there the day the nude photos were taken. (See Exhibit D). Defense counsel did not attempt to impeach Toni with her prior statement to law enforcement.

Toni's credibility was critical to the government's case. Together with the failure to cross-examine Agent Hartwig, which will be addressed in the next section, defense counsel's failure to impeach Toni's credibility fell below the standards set forth in *Strickland*.

### G. Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to cross-examine FBI Special Agent Ingri Hartwig on material issues.

Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to cross-examine FBI Special Agent Ingri Hartig on three material issues.

First, on direct examination, Agent Hartwig repeatedly testified that emails were between "defendant" and Toni. As reflected in the trial transcripts, and as set forth fully in an exhibit from Movant's pro se filing (Exhibit E), Agent Hartwig testified approximately 74 times that the "defendant" sent the email at issue. Moreover, Hartwig testified that as a result of her investigation, she *knew* that john@idu2.com was Gabriel. (Tr. 67).

Identity of who sent the emails to Toni – including the emails sent from the email address "john@idu2.com" – was central to the issue of guilt at trial. The overwhelming majority of the

evidence presented by the government was utilized to make the case that Gabriel did – in fact – send all of the introduced emails to Toni. Nevertheless, defense counsel did not challenge Hartwig's characterization of the evidence that the emails were definitively from Gabriel.

Second, on direct examination, Agent Hartwig was asked the following leading question, without objection: "Agent Hartwig, did you find naked sex-explicit photos of Toni on the computer taken from the defendant's phone?" to which she answered, "Yes, I did." This testimony was demonstrably false, as the government conducted a forensic examination of Gabriel's phone and therefore knew there were no sexually explicit photos of Toni on his phone. (see Exhibit F). Although Toni testified that Gabriel took photos of her with a camera, that did not correct the error, as she was not asked to clarify that she was referring to an actual camera, and not a camera phone. FBI Special Agent Hartwig was the lead investigating agent, and knew that there were no photos of Toni found on Gabriel's phone. Defense counsel did not object or otherwise raise the issue with the Court to ask that the government correct the false testimony, nor did counsel cross-examine Hartwig on the testimony. Because this testimony went unchallenged, the jury was allowed to accept it as true. This error was critical. Smart phones and phones with cameras are ubiquitous. Such phones are also almost always directly tied to an individual person because it is used for calls and texts as well, as opposed to a traditional camera, which is used only to take photos and is therefore more likely to be used by someone other than the "owner" of the camera. By leaving the jury with the impression that the nude photos of Toni were taken with Gabriel's phone, counsel effectively conceded guilt.

Third, on January 13, 2013, Agent Hartwig interviewed Joshua Perez, who was called as a witness for the defense. In that interview, Perez told Hartwig that in July of 2012, he had seen an email on Margarita's phone, which was from Gabriel's email account, from someone

identifying themselves as "Melissa," stating "He's cute."  (See Exhibit G). Defense counsel did not ask Hartwig a single question about this information Hartwig obtained from Perez, despite the fact that it suggests that Melissa and/or Margarita were using Gabriel's email account.

It was objectively unreasonable for defense counsel to not raise these issues.

**H.      Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to argue a defense based on the evidence.**

In closing, defense counsel called the jury's attention to Toni's lie about never having spoken with Margarita about the program, and also called attention to Perez's unusually intense interest in the investigation and prosecution of Gabriel. However, counsel did not argue any of the major problems with the government's case, problems that went right to the heart of the question of whether or not the government had proved its case beyond a reasonable doubt.

First, The identity of Gabriel as the person who sent all of the emails to Toni was a central issue at trial.  The government stated in its closing, "we kind of have to answer a fairly big question in this story. Who are Sarah Weatherby, Diane McCarthy, and all of these other women that were emailing with Toni? All of the evidence in this case points to only one person, and that is the defendant." (Tr. 632-33).  The government relied heavily on the letter that Gabriel sent to Margarita as "Di," the letters from Crystal to "Di," and the fact that Gabriel "benefitted," from "the program." In closing, defense counsel merely stated, "If we move past the fictitious emails and the subpoenas, it comes down to what one person said versus what the other person said." (Tr.655).  Due to the fact that the vast majority of the testimony in this case was about the emails, and the fact that there was evidence to counter the government's argument, the failure to argue the evidence in closing was constitutionally ineffective.

Some of the emails to Toni – including some of the more direct evidence of photos being taken and websites being created – came from the address "john@idu2.com." Toni received those emails, and also testified that she was in personal contact with Gabriel during the time that she was receiving those emails. On direct examination, Toni testified that she exchanged emails with john@idu2.com, and she "just figured it was John." (Tr. 403). Common sense dictates that if she were in fact emailing with Gabriel and speaking with him, that the fact of the emails and their contents would have come up in conversation. Apparently it did not, and counsel did not argue this to the jury.

Counsel presented evidence, through Gabriel, to explain the letter from "Di," to Margarita, which not only highlighted the fact that there was nothing in that letter to suggest a sexually-based program involving underage boys, but also the fact that Margarita was also very aware of the pseudonym "Di," and could very well have been the author of the emails on her own. This is particularly compelling given the fact that, on cross of Agent Hartwig, defense counsel brought out the fact that Margarita's phone had words of interest in it, including "novatas," "Mygirls4god," and "mejohng," words that were directly related to the charges in this case. Importantly, "mygirls4god" was the email handle of Sarah Weatherby, and "mejohng" was the first part of Gabriel's undisputed email address. There was also evidence that Margarita – or anyone else who came into Gabriel's home – had access to Gabriel's computer and passwords. Moreover, it was undisputed that Margarita herself sent sexually explicit emails to Eddie Kline, including a nude photo of Toni. None of this evidence, or its significance, was argued to the jury.

Third, the dates on which Theis testified the sexually explicit photos of Toni were created in a website design program post-dates the date of the emails to Toni in which "John" writes that

he put together Toni's website. Agent Hartwig read an email from John to Toni from July 11, 2012, in which John wrote that he put together seven pages for Toni's website, somethinnice.com, and gave a user name and password. In another email on July 11, 2012, Toni wrote that she liked the website, and commented that she looked like she was in paradise, and referenced an ice cream cone. John referenced what was presumably a photo, in which there was a cat staring at Toni's "butt." John wrote that he added a chat room to the website. However, Michael Theis of the RCFL testified that the sexually explicit photos of Toni found on a computer in Gabriel's home were put on the computer into a design application used to create webpages for the internet on July 12, 2012. The date of the emails and the date that the photos were put on the computer cannot be reconciled. Nevertheless, counsel did not mention this major discrepancy in closing.

Fourth, in her testimony about photos of Melissa found on a computer in Gabriel's home, Hartwig testified that the creation date of the photos was July 5, 2012. Hartwig also testified that there were "dozens" of photos of Melissa on the computer, which bore various creation dates, all in 2012. (Tr. 614-15). Hartwig did not identify a photo of Melissa – or anyone else, including Toni, that was created on July 7, 2012. Throughout this case, the government argued that Melissa and Toni had photos taken on the same date. Despite this major flaw in the government's case, defense counsel did not bring the inconsistencies to the jury's attention.

In a case that is so driven by dates and credibility, it is impossible to find a reasonable strategy for not arguing the aforementioned in closing argument.

Moreover, when considered in concert with the information that was not brought out at trial, and the information that was improperly allowed in evidence, it is clear that Gabriel was denied effective assistance of counsel at trial, as guaranteed by the Sixth Amendment.

While a single oversight by counsel typically does not violate the sixth amendment, as "judges must not examine a lawyer's error (of omission or commission) in isolation." *Williams* 557 F.3d at 538. Here, when the Court evaluates the errors set forth *supra*, that is "the entire course of the defense," it is clear that Gabriel did not have the counsel of which the Sixth Amendment speaks. With all of the above errors in mind, it is also clear that had these matters been brought out at trial, there is a reasonable probability that the jury would have found that the government did not meet its burden. Accordingly, there was prejudice to Gabriel, as defined in *Strickland*.

I.    **Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to object to the constructive amendment of the Indictment.**

Gabriel's Sixth Amendment right to the effective assistance of counsel at trial was violated when counsel failed to object to the constructive amendment of the indictment. The original indictment filed in this case charged Gabriel as follows:

> JOHN GABRIEL, defendant herein, knowingly employed, used, persuaded, induced, and enticed a minor, namely, Victim A, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, which visual depiction defendant knew and had reason to know would be transported and transmitted using any means and facility of interstate and foreign commerce, and which visual depiction was transported and transmitted using any means and facility of interstate and foreign commerce, and such visual depiction was produced and transmitted using materials that had been mailed, shipped, transported, and transmitted in and affecting interstate and foreign commerce by any means; In violation of Title 18 United States Code, Section 2251(a).

On February 27, 2015, just prior to trial, the government filed a Motion to Amend Indictment to Strike Surplusage and and Correct Non-Substantive Error. (R. 65). In relevant part, the motion asked this Court to strike from Count I, "which visual depiction defendant knew and

56

had reason to know would be transported and transmitted using any means and facility of interstate and foreign commerce." The government reasoned that, "under Section 2251(a), the government is only required to prove one method in which the crime affected interstate or foreign commerce, but the indictment alleges all three potential methods. See Seventh Circuit Committee (2012) at page 725-26. Accordingly, *to avoid jury confusion*, the government seeks to strike, as surplusage, the above-referenced language, which alleges one of the three possible methods in which the crime affected interstate of foreign commerce." (*Id.*) (emphasis added).

Defense counsel did not object to the government's motion to strike the language in Count I.

During the jury instruction conference on March 18, 2015, the government advised the Court that, "on the third element, as we discussed the other day, the government is sticking with the indictment as charged where there is a third interstate nexus." (Tr. 590).

The jury was instructed as follows:

> The indictment charges the defendant with sexual exploitation of a minor. In order for you to find the defendant guilty of this charge, the government must prove each of the three following elements beyond a reasonable doubt: First, that in or about the time alleged in the indictment, individual A was under the age of 18 years; Two, that the defendant knowingly employed, used, persuaded, or coerced individual A to take part in sexually-explicit conduct for the purpose of producing a visual depiction of such conduct; and Three, that the defendant knew or had reason to know that the visual depiction would be transported or transmitted using any means or facility of interstate or foreign commerce; or which visual depiction was transported or transmitted using any means or facility of interstate or foreign commerce; or that such visual depiction was produced or transmitted using materials that had been mailed, shipped, or transported across state lines or in foreign commerce. If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt, then you should find the defendant guilty on the charge in the indictment.

(Tr. 627-28).

While the indictment charged the alternative means of proving each element of the offense in the conjunctive, the jury instructions were worded in the disjunctive. The jury was not instructed that it must be unanimous in its findings as to the alternatives in the interstate commerce element. Accordingly, the jurors were allowed to reach a verdict without requiring unanimity as to which means of interstate commerce it found the government proved. It is Mr. Gabriel's position that the jury instructions constructively amended the indictment in his case. "Ever since *Ex parte Bain*, 121 U.S. 1, was decided in 1887 it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself. *Stirone v. United States*, 361 U.S. 212, 215-16 (1960). Because "the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury," *Stirone v. United States*, 361 U.S. at 217, Mr. Gabriel submits that the charges in his indictment were improperly broadened, and trial counsel should have objected to amendment of the indictment in the jury instructions. Mr. Gabriel further submits that this error prejudiced him, because there is no way to know what the jury actually found him guilty of, in violation of his right to a fair trial under the Fifth Amendment.

**III.   GABRIEL WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

Gabriel's Sixth Amendment right to the effective assistance of counsel on appeal was violated when counsel failed to raise the following issues on appeal: Ineffective assistance of counsel for failure to object to the admission of the Toni emails as hearsay and unfairly prejudicial; Ineffective assistance of counsel for failure to object to the admission of the Eddie Kline emails as hearsay and unfairly prejudicial; Ineffective assistance of counsel for failure to object to the admission of the Crystal Barnabee letters for lack of authentication, as hearsay and

unfairly prejudicial; and Ineffective assistance of counsel for failure to object to the constructive amendment of the indictment.

Sixth Amendment ineffective assistance of counsel claims are often raised collaterally in a petition under 28 U.S.C. § 2255 "to allow for supplementation of the record with evidence pertinent to the asserted attorney error." *"However, where a defendant confines his claim to the existing record and is represented by different counsel on appeal, an ineffective assistance of counsel argument is proper on direct appeal." United States v. Stewart*, 388 F.3d 1079, 1083 (7th Cir. 2004) (internal citations omitted).

Appellate counsel only raised two issues on appeal: that the district court procedurally erred by not justifying lifetime supervised release in accordance with 18 U.S.C. § 3583(c); and that various discretionary supervised release conditions were invalid because the court imposed them without making any findings to justify them. The aforementioned issues listed in this section were apparent from the record on appeal, have merit, and should have been raised by appellate counsel. Appellate counsel's failure to do so was objectively unreasonable.

## IV. GABRIEL WAS DENIED HIS FIFTH AMENDMENT RIGHT TO A FAIR TRIAL BY THE GOVERNMENT'S USE OF FALSE TESTIMONY

Every criminal defendant has the right to a fair trial pursuant to the Fifth Amendment of the United States Constitution. Gabriel was denied his Fifth Amendment Right to a fair trial when the prosecution knowingly elicited false testimony.

On direct examination, Agent Hartwig was asked the following leading question, without objection: "Agent Hartwig, did you find naked sex-explicit photos of Toni on the computer taken from the defendant's phone?" to which she answered, "Yes, I did." This testimony was demonstrably false, as the government conducted a forensic examination of Gabriel's phone and therefore knew there were no sexually explicit photos of Toni on his phone. (see Exhibit F).

It is well-established that the government may not obtain a conviction through use of false evidence. *Napue v. Illinois,* 360 U.S. 264, 269 (1959).  Here, FBI Special Agent Hartwig was the lead investigating agent, and knew that there were no photos of Toni found on Gabriel's phone. Moreover, the government solicited the false testimony with its leading question, "did you find naked sex-explicit photos of Toni on the computer taken from the defendant's phone?" When a witness testifies falsely, the government has a "duty to correct what he knows to be false and elicit the truth." *Napue,* 360 U.S. at 270.   The government did not correct this false testimony.

In *United States v. Freeman*, the District Court granted a new trial based on the knowing use of false testimony, where a government witness testified that one defendant in a drug conspiracy was present for a conversation involving the conspiracy, when that defendant was, in fact, in custody at the time the witness said the conversation took place. *United States v. Freeman*, No. 07 CR 843, 2009 U.S. Dist. LEXIS 76973, at *13-15 (N.D. Ill. Aug. 26, 2009).

In granting the new trial, the district court acknowledged that "following *Napue,* the Seventh Circuit has established that to receive a new trial on the basis of the government's use of allegedly perjured testimony, a defendant must show that "(1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a likelihood that the false testimony affected the judgment of the jury." *Freeman*, 2009 U.S. Dist. LEXIS 76973, at *20. The Seventh Circuit affirmed the granting of the new trial. *United States v. Wilbourn*, 799 F.3d 900, 904 (7th Cir. 2015).

Here, the ultimate question the jury had to answer was whether or not John Gabriel took sexually explicit photos of Toni. Agent Hartwig was the lead investigating agent, and knew that there were no photos of Toni found on Gabriel's phone. Because this testimony went

unchallenged, the jury was allowed to accept it as true. This error was critical. Smart phones and phones with cameras are ubiquitous. Such phones are also almost always directly tied to an individual person because it is used for calls and texts as well, as opposed to a traditional camera, which is used only to take photos and is therefore more likely to be used by someone other than the "owner" of the camera. Accordingly, Gabriel has met all three elements required for the Court to grant a new trial due to the government's knowing use of false testimony.

## V.   CONCLUSION

For all of the reasons stated herein, Movant John Gabriel requests that the Court:

(a)   Hold an evidentiary hearing on the claims he has brought; and

(b)   Grant appropriate relief under 28 U.S.C. § 2255, including

1.   Dismissal of the indictment; or

2.    a new trial.

Respectfully submitted,

/s/ *Melissa A. Matuzak*
MELISSA A. MATUZAK

Melissa A. Matuzak
Law Office of Melissa A. Matuzak
53 West Jackson Blvd.
Suite 1650
Chicago, Illinois 60604
(312)986-1985
melissamatuzak@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

     Melissa A. Matuzak, Attorney at Law, hereby certifies that the foregoing Memorandum in Support of Amended Motion To Vacate And Set Aside Judgment And Sentence Pursuant To 28 U.S.C. § 2255, was filed on July 13, in accordance with Fed.R.Civ.P.5., LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ *Melissa A. Matuzak*
**MELISSA A. MATUZAK**

**LAW OFFICE OF MELISSA A. MATUZAK**
53 West Jackson Boulevard
Suite 1650
Chicago, Illinois 60604
Tel: (312) 986-1985
Fax: (312) 663-3707
melissamatuzak@gmail.com